UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| ROCIO GUTIERREZ<br>AS REPRESENTATIVE OF<br>THE ESTATE OF AXEL HIRAM<br>GUTIERREZ, DECEASED, AND<br>MARIA CARRILLO A/N/F OF V.G.,<br>A MINOR,<br>    *Plaintiffs*, | § § § § § § § § § | |
| VS | § § | CIVIL ACTION _____ |
| CITY OF PORT ISABEL,<br>PORT ISABEL POLICE DEPARTMENT,<br>ROBERT LOPEZ, CHIEF OF POLICE TOWN<br>OF PORT ISABEL, OFFICER VICTOR<br>VILLARREAL, OFFICER DANIEL<br>HOLLAND, SERGEANT RAMON<br>TELLO,<br>    *Defendants*. | § § § § § § § § § | |

**PLAINTIFFS' ORIGINAL COMPLAINT**

**TO THE HONORABLE JUDGE OF SAID COURT:**

Comes now ROCIO GUTIERREZ, as Representative of the Estate of AXEL HIRAM GUTIERREZ, Deceased, and MARIA CARRILLO as Next Friend of V.G., a minor child of the decedent, (hereinafter "Plaintiffs"), and files this Original Complaint and would show as follows:

## I.    PARTIES

1. Plaintiff ROCIO GUTIERREZ is an adult resident of Texas and sues on behalf of herself and as a representative of the ESTATE OF AXEL HIRAM GUTIERREZ, Deceased.

2. Plaintiff MARIA CARILLO is an adult resident of Texas who sues on behalf of the minor child of decedent AXEL HIRAM GUTIERREZ referred to here as V.G.

Page **1** of **18**

3. Defendant CITY OF PORT ISABEL (hereinafter "the CITY") is a Texas municipality located in Cameron County, Texas. Service of process may be accomplished by serving its City Secretary, Susie Alcocer, 305 Maxan, Street, Port Isabel, Texas 78578.

4. Defendant PORT ISABEL POLICE DEPARTMENT (hereinafter "PORT ISABEL PD") may be served by serving Robert Lopez, Chief of Police at 110 W. Hickham Avenue, Port Isabel Texas 78578.

5. Defendant CHIEF OF POLICE ROBERT LOPEZ (hereinafter "CHIEF LOPEZ") is the Chief of Police of the Port Isabel Police department and may be served at 110 W. Hickham Avenue, Port Isabel, Texas. 78578. At all times material throughout this complaint, CHIEF LOPEZ acted under color of state law, ordinance, practice, and/or regulation, and in the course and scope of his employment.

6. Defendant SERGEANT RAMON TELLO (hereinafter "SERGEANT TELLO") is employed by the Port Isabel Police Department and may be served at 110 W. Hickham Avenue, Port Isabel, Texas 78578. At all times material throughout this complaint, Defendant SERGEANT TELLO acted under color of state law, ordinance, practice, and/or regulation, and in the course and scope of his employment.

7. Defendant OFFICER DANIEL HOLLAND (hereinafter "OFFICER HOLLAND") is employed by the Port Isabel Police Department and may be served at 110 W. Hickham Avenue, Port Isabel, Texas 78578. At all times material throughout this complaint, OFFICER HOLLAND acted under color of state law, ordinance, practice, and/or regulation, and in the course and scope of his employment.

8. Defendant DISPATCHER VICTOR VILLARREAL (hereinafter "DISPATCHER VILLARREAL") is employed by the Port Isabel Police Department as a dispatcher and may be

served at 110 W. Hickham Avenue, Port Isabel, Texas, 78578.  At all times material throughout this complaint, DISPATCHER VILLARREAL acted under color of state law, ordinance, practice, and/or regulation, and in the course and scope of his employment.

9. The CITY, PORT ISABEL PD, CHIEF LOPEZ, SERGEANT TELLO, OFFICER HOLLAND, and DISPATCHER VILLARREAL are hereinafter collectively referred to as "Defendants".

## II.   JURISDICTION

10. This court has federal jurisdiction over the claims raised in this complaint under 42 U.S.C.A. § 1983 and 28 U.S.C.A. § 1331 and pendent jurisdiction under 28 U.S.C.A § 1367 over the state law claims.

11. Venue is appropriate in the Southern District of Texas under 28 U.S.C.A. § 1391 as Defendants reside in Cameron County, Texas, and the acts supporting this complaint, occurred in the Southern District of Texas.

12. Plaintiffs invoke the protections guaranteed under the Due Process Clause of the 14th Amendment to the United States Constitution and their Texas counterparts.

## III.   FACTS COMMON TO ALL

13. The events underlying the above referenced and numbered cause occurred on or about September 26, 2019.

14. Prior to his suicide in the Port Isabel Jail on or about September 26, 2019, AXEL HIRAM GUTIERREZ (hereinafter "AXEL") attempted suicide several times. First in 2008 and again in 2014, which was reported by the Cameron County Sheriff's Department. Then, on or about June 13, 2018, during a wellness check by the PORT ISABEL PD, AXEL reported to the

police that he was suicidal and was transported to a local hospital for mental health treatment. Further, AXEL also suffered bi-polar disorder and depression.

15.     On or about September 26, 2019, AXEL was stopped and arrested by OFFICER HOLLAND and SERGEANT TELLO at 2:29 a.m. while driving a vehicle on a public street for failing to signal a turn, failing to have his headlights on and suspicion of driving under the influence. AXEL acted in a bizarre manner at the scene as he refused to exit his vehicle, claiming he felt safe in the car and had to be forcibly removed from the vehicle.

16.     At the time AXEL was booked into the jail, OFFICER HOLLAND began filling out a "Screening Form for Suicide and Medical/Mental/Development Impairments," (hereinafter "Screening Form") a true copy of which is attached hereto as **Exhibit A**.

17.     OFFICER HOLLAND had no training on how to properly complete the Screening Form or how to follow the protocols on the form. OFFICER HOLLAND only filled in his own name, AXEL's name and the date, along with a line across the entire form with the word "Refused" on it because AXEL allegedly had refused to answer any questions when he was arrested. Due to his lack of training, OFFICER HOLLAND did not know that he was required to ask AXEL to answer questions on the Screening Form. The Screening Form had questions posed directly to OFFICER HOLLAND that he was required to answer as well. However, due to OFFICER HOLLAND's lack of training, OFFICER HOLLAND failed to ask AXEL any of the related suicidal questions located on the Screening Form, but OFFICER HOLLAND also failed to answer any of the suicidal related questions directed to him. *See* **Exhibit A**.

18.     *Due to his lack of training in assessing and protecting suicidal detainees/inmates*, OFFICER HOLLAND also did not know he was required to follow and did not follow any of the requirements in the protocols on the Screening Form. These protocols directed OFFICER

HOLLAND to and do the following: (1) "[p]lace inmate on suicide watch if Yes to 1a-1d or at any time jailer/supervisor believe it is warranted;" (2) "[i] Yes to 1a, 1b, 1c, or 1d below, notify supervisor, magistrate and mental health immediately;" and (3) "[i]s the inmate unable to answer questions? If yes, note why, notify supervisor and place on suicide watch until form completed."

19. *Due to his lack of training in assessing and protecting suicidal detainees/inmates*, OFFICER HOLLAND did not follow the protocols as he did not place AXEL on suicide watch and did not notify supervisors, fellow officers and/or mental health immediately that AXEL was suicidal.

20. *Due to his lack of training in assessing and protecting suicidal detainees/inmates*, OFFICER HOLLAND never informed mental health officials AXEL was suicidal and did not transport AXEL to a hospital and/or call 911 for a mental health evaluation.

21. *Due to his lack of training in assessing and protecting suicidal detainees/inmates,* OFFICER HOLLAND put AXEL alone in a cell with metal bars and pinch points and allowed him to wear his t-shirt and jeans (rather than paper clothing), which he would use to hang himself in his cell over an 18-minute period of time.

22. *Due to his lack of training in assessing and protecting suicidal detainees/inmates,* OFFICER HOLLAND and all Defendants did not know there was a significantly increased risk a suicidal detainee/inmate would try to commit suicide if no personnel were present inside the jail to monitor him; nor did OFFICER HOLLAND and all Defendants know that due to lack of training, there was a significant risk a suicidal detainee would attempt suicide if placed alone in a single cell with his clothing, which are known to trained officers to be used by suicidal detainees/inmates to commit suicide.

23. *Due to all Defendants lack of training in assessing and protecting suicidal detainees/inmates,* no police officers, jailers or civilian employees were assigned to work inside the jail. As a result, even though the protocol required putting AXEL on suicide watch, no one was present inside the jail to monitor AXEL and prevent him from hanging himself.

24. *Due to his lack of training in assessing and protecting suicidal detainees/inmates,* OFFICER HOLLAND did not place AXEL on suicide watch and/or inform supervisors, magistrate and mental health, including DISPATCHER VILLARREAL to monitor more frequently, that Axel was suicidal.

25. DISPATCHER VILLARREAL was a civilian 911 operator who also had no training in how to assess and protect suicidal detainees/inmates. DISPATCHER VILLARREAL also had no training in how to properly monitor a detainee/inmate who was supposed to be on suicide watch. Since DISPATCHER VILLARREAL was not present inside the jail, all Defendants *knew* that if DISPATCHER VILLARREAL was to monitor AXEL, he would have to rely solely on a remote video feed and a radio intercom. All Defendants also *knew* that since DISPATCHER VILLARREAL's primary duties were to process 911 calls, DISPATCHER VILLARREAL would not be able to view the video monitor of AXEL at all when he was processing a 911 call due to him being required to communicate with the caller and officers to carry out those responsibilities.

26. *Due to his lack of training in assessing and protecting suicidal detainees/inmates,* OFFICER HOLLAND was unaware that by not informing DISPATCHER VILLARREAL that AXEL was suicidal and by relying solely on DISPATCHER VILLARREAL to monitor AXEL remotely from another building based on a video feed, that there was a significant risk AXEL would be able to use his clothing to hang himself without being seen by anyone because no one

was present inside the jail to watch him and DISPATCHER VILLARREAL would be unable to observe the TV monitor when he was performing his 911 duties and responsibilities.

27. *Due to lack of training in assessing and protecting suicidal detainees/inmates*, CHIEF LOPEZ, SERGEANT TELLO, OFFICER HOLLAND and DISPATCHER VILLERREAL were unaware that suicidal detainees/inmates should never be allowed their clothing which are *known* by trained personnel to be used by suicidal detainees/inmates to hang themselves in a cell metal bars with pinch points.  OFFICER HOLLAND placed AXEL in a metal cell with pinch points and his clothing instead of paper clothing, which AXEL ultimately used both his pants and t-shirt to hang himself.

28. *Due to lack of training in assessing and protecting suicidal detainees/inmates,* CHIEF LOPEZ, SERGEANT TELLO, OFFICER HOLLAND and DISPATCHER VILLARREAL were unaware of the requirements for following the protocol on the Screening Form, which was to place AXEL on suicide watch, notify supervisors and mental health officials in the event he was unable to answer the required questions. Defendants were unaware of the requirement to place AXEL on have on suicidal watch until AXEL completed the questions on the Screening Form.

29. *Due to lack of training in assessing and protecting suicidal detainees/inmates*, none of the Defendants requested additional personnel to monitor AXEL when he was supposed to be put on suicide watch, particularly when DISPATCHER VILLARREAL was not able to monitor him while handling 911 calls.

30. *Due to lack of training in assessing and protecting suicidal detainees/inmates,* none of the Defendants maintained a suicide log to document the times and condition of AXEL when he was actually monitored while on suicide watch.

31.   *Due to their lack of training in assessing and protecting suicidal detainees/inmates,* Defendants did not know or chose to deliberately ignore the obvious fact that a suicide watch could not be effectively carried out relying solely on a civilian 911 dispatcher employee with no training, who was not present inside the jail and who did not use remote video monitoring when he was performing 911 call duties.

32.   During a twenty (20) minute period beginning at 3:43 a.m. until 4:03 a.m. on September 26, 2019, while DISPATCHER VILLARREAL was handling a 911 call, had DISPATCHER VILLARREAL looked at the video monitor one time he would have plainly seen AXEL take deliberate steps to hang himself. At 3:43 a.m. AXEL *could* be plainly seen on the video beginning his suicide attempt by removing his shirt, wrapping it around his neck and attaching it to the cell bars. At 3:45 a.m., AXEL *could* then be plainly seen on the video wrapping his jeans around his neck and bars, to reinforce his shirt which was already around his neck and attached to the cell bars. When the jeans did not seem to work, between 3:45 a.m. and 3:50 a.m. AXEL *could* next be seen on the video monitor DISPATCHER VILLARREAL was *supposed* to be watching making various adjustments to his t-shirt that is wrapped around the bars. During this same time, AXEL *could* also be seen on the video monitor DISPATCHER VILLARREAL was *supposed* to be watching, testing the strength of t-shirt because that is when he begins walking his feet out in front of his body. It is unknown when DISPATCHER VILLARREAL first looked at AXEL on the monitor, but it is known that DISPATCHER VILLARREAL discovered AXEL was hanging when he looked at the monitor at 4:03 a.m. and saw AXEL "standing near the cell door with his shirt off." AXEL did not respond to DISPATCHER VILLARREAL's efforts to communicate with him over the intercom. Between 3:43 a.m. and 4:03 a.m. there was no one present inside the jail to prevent AXEL from hanging himself and no one inside the jail for DISPATCHER VILLARREAL

to call for assistance. At 4:03 a.m. DISPATCHER VILLARREAL radioed OFFICER HOLLAND and SERGEANT TELLO who were in the field on a 911 call to return to the jail and check on AXEL. DISPATCHER VILLARREAL also called 911. When OFFICER HOLLAND entered the cell at an unknown time, he found AXEL hanging, attempted CPR without resuscitating him. AXEL was transferred to a local hospital where life supports were withdrawn on September 28, 2019.

33. AXEL's death was caused by asphyxiation due to hanging on September 26, 2019.

34. Due to prior incidents and by the terms of the protocols located in the Screening Form, Defendants were aware AXEL was suicidal. Due to a lack of training or because they chose to ignore it, Defendants failed to follow any of the suicide prevention protocols on the Screening Form.

35. Due to a custom and practice of the CITY, PORT ISABEL PD, and CHIEF LOPEZ, to not provide any training to its officers and employees on how to properly assess and protect suicidal detainees/inmates, neither the CITY or CHIEF LOPEZ, nor PORT ISABEL PD published any written policies or provided any training for CHIEFL LOPEZ, SERGEANT TELLO, OFFICER HOLLAND and DISPATCHER VILLEARREAL to follow that would include a jail prevention suicide plan and training on procedures to be followed to properly assess, protect and monitor suicidal detainees/inmates.

**IV.  COUNT I: WRONGFUL DEATH AND SURVIVAL CLAIMS AND CLAIMS UNDER 42 U.S.C.A. § 1983 AND SECTIONS 71.002 AND 71.021 (A) TEXAS CIVIL PRACTICES AND REMEDIES CODE**

36. Plaintiffs re-allege Paragraphs 1–35 of the Complaint.

37. Defendants, specifically, the CITY, PORT ISABEL PD, and CHIEF LOPEZ are legally liable for the wrongful death and suicide of AXEL because it occurred due to a widespread custom and well-known practice to provide *no* training to the police officers and civilian 911

operators on how to properly assess and protect pre-trial detainees/inmates from committing suicide. The individual Defendants are not entitled to Qualified Immunity because they acted with deliberate indifference in protecting AXEL's well established Due Process rights under the 14th Amendment to be provided mental health care and be protected from the risk of suicide while a jail detainee/inmate.

38. The custom and practice to provide no suicide assessment and suicide prevention training to police officers and employees was actually or constructively known to the elected officials of the CITY and the CITY since they never provided, paid for or required such training. The CITY *knew* of this custom and practice because they *knew* of the following facts:

A. CHIEF LOPEZ was hired several months before these events to be Chief of the Police Department and senior officer in charge of jail operations despite the fact that he was *not certified* as a jailer by the Texas Peace Officers Association. Although all police officers receive some Crisis Intervention Training (CIT) to assist them when handling situations involving persons with mental health crisis in response to 911 calls in the field, the CITY *knew* CHIEF LOPEZ had received no formal training in suicide assessment and prevention with respect to jail detainees/inmates. Due to CHIEF LOPEZ'S lack of training in suicide assessment and suicide prevention relating to detainees/inmates, CHIEF LOPEZ never implemented any Suicide Prevention Plans. Neither the CITY, PORT ISABEL PD, nor CHIEF LOPEZ ever required or provided any formal training to officers and civilian 911 operators on how to properly make suicide assessments and how to prevent suicide by jail detainees/inmates.

B. Defendants, specifically, SERGEANT TELLO, OFFICER HOLLAND, and

DISPATCHER VILLARREAL also had no training in suicide assessment and training by jail detainees/inmates, and as a result:

1. Although they had access to, they chose to ignore records of prior suicide attempts and suicidal ideations.

2. They either deliberately ignored or due to a lack of training failed to properly complete the Screening Form (Holland failed to answer any of the questions directed to him) and failed to follow any of the written protocols in the Screening Form.

3. Due to none of the suicide related questions 1a – 1d being answered, the protocol on the Screening Form was not followed at all. The question stated "Is the inmate unable to answer the questions? If yes, note why, notify supervisor and place on suicide watch until the form completed."

4. This custom of providing no training on suicide assessment and prevention, resulting in OFFICER HOLLAND not completing the form and not following any of the protocols requiring him to notify his supervisors, magistrate, and mental health that AXEL was suicidal and placing him on suicide watch.

5. Due to their lack of training (SERGEANT TELLO, OFFICER HOLLAND and DISPATCHER VILLARREAL) AXEL was not placed on suicide watch but was put alone in a cell in an extremely dangerous condition with his clothing and no one observing him, which trained persons know creates conditions suicidal detainees/inmates use to hang themselves.

      6.      Due to lack of training, SERGEANT TELLO and OFFICER HOLLAND relied solely on an untrained civilian 911 dispatcher in another building to monitor AXEL without telling him AXEL was on suicide watch, knowing DISPATCHER VILLARREAL was not able to observe him on a remote television monitor when he was handling 911 calls.

C.      As a direct and proximate result of the widespread and well known custom and practice of providing no suicide assessment and prevention training with respect to jail detainees/inmates, CHIEF LOPEZ, SERGEANT TELLO, OFFICER HOLLAND and DISPATCHER VILLARREAL, individually and as agents and/or employees of the CITY and PORT ISABEL PD, deprived AXEL of his well-established rights and privileges under the Due Process Clause of the 14th Amendment to receive medical care and to be protected from suicide causing AXEL to suffer wrongful injury and death, which has caused the damages requested by Plaintiffs in an amount in excess of the applicable jurisdictional amount, to be proven at trial.

D.      The claims and causes of action for injuries and death of AXEL are brought in this action pursuant 42 U.S.C.A. § 1983 and under the Texas Wrongful Death and Survival Act, Texas Civil Practice and Remedies Code section 71.000 et seq.

V.    **COUNT II: MUNICIPAL LIABILITY UNDER 1983 BASED ON CUSTOM OF NO TRAINING AND USING UNQUALIED NON-CERTIFIED JAILERS TO IDENTIFY AND PROTECT SUICIDAL DETAINEES/INMATES; INDIVIDUAL DEFENDANTS DO NOT ENJOY QUALIFIED IMMUNITY**

39.      Plaintiffs re-allege Paragraphs 1–38 of the Complaint.

40.      On September 26, 2019, CHIEF LOPEZ, SERGEANT TELLO, OFFICER

HOLLAND and DISPATCHER VILLARREAL were agents and/or employees of the CITY and PORT ISABEL PD and intentionally and unreasonably deprived AXEL of his well-established rights, privileges and immunities secured by the Due Process clause of the 14th Amendment of the U.S. Constitution, its Texas counterpart, and 42 U.S.C.A. § 1983 in a willful and wanton fashion.

41. Prior to and on September 26, 2019, Defendants *knew* that by operating a jail that annually housed as many as a hundred or more pre-trial detainees/inmates, that it was statistically foreseeable that some detainees/inmates would have mental health and suicidal problems. The act of arresting and jailing such person substantially increases the risk of suicide.

42. The CITY and CHIEF LOPEZ also *knew* that because the CITY did not employ *anyone* who was assigned to work inside the jail, let alone any person, including CHIEF LOPEZ, who was certified as a jailer by the Texas Peace Officers Association, that their custom and practice to discharge their duties to protect the constitutional rights of suicidal detainees/inmates to be protected from committing suicide would require using police officers and civilian dispatchers to perform the role of certified jailers even though they would not be present in the jail and would not be provided any training in the assessment and protection of detainees/inmates from suicide.

43. DEFENDANTS also *knew*, or should have been obviously known, that in order to protect suicidal detainees/inmates, that reliance on untrained officers to perform the function of certified jailers to assess and protect suicidal detainees/inmates would result in OFFICER HOLLAND's failure to complete the suicide Screening Form properly; OFFICER HOLLAND's failure to follow the protocols on the Screening Form by failing to assess AXEL as suicidal; failure to place AXEL on suicide watch and notify supervisors, magistrate, and mental health;

and there was a complete failure to monitor AXEL for at least a twenty (20) minute period when AXEL should have been on suicide watch.

44. Due to the custom of not employing certified and trained jailers to work in the jail to assess and protect suicidal detainees/inmates, Defendants were deliberately indifferent to and completely failed to protect AXEL from committing suicide by placing him in a jail cell with metal bars and pinch points, with no employee inside the jail to watch him, and allowing him clothing which are well known to be used by suicidal detainees/inmates to hang themselves.

45. Due to the custom and practice of not employing certified jailers, but relying on untrained officers and 911 dispatchers to assess and protect suicidal detainees/inmates, Defendants never identified AXEL as suicidal; never placed AXEL on suicide watch, never notified supervisors, magistrate and mental health; made no arrangements for AXEL to be monitored properly by trained personnel inside the jail who could have periodic face to face monitoring of AXEL; failed to maintain a suicide monitoring log documenting the monitoring; and relied for monitoring solely on an untrained civilian 911 dispatcher in another building who was not informed he was on suicide watch who was known to be unable to monitor AXEL remotely on a video monitor when attending to his 911 duties and responsibilities.

46. The above-described policy and custom of not employing any trained personnel in the jail to properly assess and monitor AXEL imposes municipal liability on the CITY for the acts and omissions by Defendants.

47. As to the individual Defendants, CHIEF LOPEZ, SERGEANT TELLO, OFFICER HOLLAND and DISPATCHER VILLARREAL, they do not enjoy Qualified Immunity since their conduct demonstrates a deliberate indifference to and conscious disregard for the well-established due process rights of AXEL to be protected from the known and

foreseeable risk of suicide.

48. AXEL was deprived by Defendants of his due process rights under the 14th Amendment to receive medical care and to be protected from committing suicide, a constitutional right that has been well established for nearly two decades by the Fifth Circuit. Defendants, specifically, the CITY and PORT ISABEL PD, by and through their well-known custom and practices, and its agents and/or employees, CHIEF LOPEZ, SERGEANT TELLO, OFFICER HOLLAND and DISPATCHER VILLARREAL, deprived AXEL of his rights guaranteed by the United States Constitution and federal statutes by providing no protection against a foreseeably known risk of suicide.

49. The claims and causes of action for the wrongful death of AXEL are brought by his rightful heirs, individually, and on behalf of all rightful heirs, pursuant to Texas Civil Practice and Remedies Code sections 71.002-004.

## VI.   ARGUMENTS AND AUTHORITIES

50. A pre-trial detainee's constitutional right to receive medical care and protections to prevent suicide have been well settled since at least the 1990's in the Fifth Circuit. *Hare v. Corinth,* 74 F. 3d 633, 648 (5th Cir. 1996).

51. Even absent a pattern of suicides, municipal liability under 42 U.S.C.A. § 1983, for a jail suicide will exist where there was a widespread custom, of which the policy makers had actual or constructive knowledge, that employees responsible for assessing suicidal detainees/inmates and protecting them from suicide receive *no* training on the particular medical problem and thus were unqualified for suicide assessment/prevention. *City of Canton v. Harris,* 489 U.S. 378 (1989) (stating that the supervisor responsible for making assessment of detainees/inmates needing for prompt medical care had no training and this could form the basis

of 1983 municipal liability based on custom of providing no training). The Fifth Circuit follows *City of Canton*, discussed above, in *Brown v. Bryan County,* which held that municipal liability based on custom applied where no training provided to officers on limits of use of excessive force. 219 F. 3d 450, 459–61 (5th Cir. 2000); *see Drake v. City of Haltom,* 106 F. Appx. 897, 900 (5th Cir. 2004) (holding that municipal liability applied based on custom where jailers received no training on prohibitions against sexually assaulting inmates); *see also Jackson v. Valdez,* 2021 U.S. App. Lexis 14778 (5th Cir. 2021) (holding a school district liable for 1983 violations for strip searching students by nurse based on custom of providing no training despite no pattern of previous violations).

52. Based on the prior incidents involving suicidal attempts and suicidal ideations and based on the mandatory requirements in the written protocols contained in the Screening Form for Suicide, Defendants knew of or chose to deliberately ignore that AXEL was at risk for suicide. The well-known custom and practice of providing no training to its employees, who it knew were either untrained police officers or untrained civilian 911 dispatchers to assess and protect suicidal detainees/inmates is sufficient under *Canton* and its progeny to impose municipal liability for the suicide of AXEL because this custom resulted in the very preventable suicide by AXEL in the jail.

### VII.   DAMAGES

53. Defendants are jointly and severally liable for the wrongs complained of herein, either by virtue of direct participation or by virtue of encouraging, aiding, abetting, committing, and/or ratifying and condoning the commission of the above-described acts and/or omissions.

54. Plaintiffs seek actual and punitive damages for the following:

    a. Physical pain and suffering and mental anguish;

    b. Loss of love, affection, contributions, and financial and emotional support

and guidance due to the wrongful death of AXEL;

  c.  Punitive damages;

  d.  Wrongful death; and

  e.  Survivor damages.

55. Plaintiffs are also entitled to recover reasonable attorneys' fees under 42 U.S.C.A. § 1983.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiffs pray for judgment on their behalf and against all Defendants, jointly and severally, for actual and punitive damages, attorneys' fees, and for such other and further relief, general and special, to which they may be justly entitled.

Respectfully submitted,

**J. ALEX. LAW FIRM, P.C.**

By: _____
**JOSH W. ALEXANDER**
Texas Bar No. 24086984
Email: josh@jalexlawfirm.com
**KELSEY E. BRODOCK**
Texas Bar No. 24086965
Email: kelsey@jalexlawfirm.com
**DAVID W. TOWNEND**
Texas Bar No. 20155700
Email: david@jalexlawfirm.com
**ROBERT B. MOSS**
State Bar No. 24113558
Email: robert@jalexlawfirm.com
13601 Preston Road
East Tower, Suite 420E
Dallas, Texas 75240
Phone: (972) 535-5700
Fax: (844) 838-7440
**ATTORNEYS FOR PLAINTIFF**

# Exhibit A

## Screening Form for Suicide and Medical/Mental/Developmental Impairments

| County: PORT ISABEL | Date and Time: 09/26/2019 02:40 | Name of Screening Officer: Daniel Holland | |
|---|---|---|---|
| Inmate's Name: AXEL HIRAM GUTIERREZ | Gender: M | DOB: [redacted] | If female, pregnant? Yes ☐ No ☐ Unknown ☐ |

| |
|---|
| Serious injury/hospitalization in last 90 days? Yes ☐ No ☐ If yes, describe: |
| Currently taking any prescription medications? Yes ☐ No ☐ If yes, what: |
| Any disability/chronic illness (diabetes, hypertension, etc.) Yes ☐ No ☐ If yes, describe: |
| Does inmate appear to be under the influence of alcohol or drugs? Yes ☐ No ☐ If yes, describe: |
| Do you have a history of drug/alcohol abuse? If yes, note substance and when last used |
| *Do you think you will have withdrawal symptoms from stopping use of medications or other substances (including alcohol or drugs) while you are in jail? If yes, describe |
| *Have you ever had a traumatic brain injury, concussion, or loss of consciousness? Yes ☐ No ☐ If yes, describe: |
| *If yes, Notify Medical or Supervisor Immediately |

*Place inmate on suicide watch if Yes to 1a-1d or at any time jailer/supervisor believe it is warranted*

| | YES | NO | "Yes" Requires Comments |
|---|---|---|---|
| **IF YES TO 1a, 1b, 1c, or 1d BELOW, NOTIFY SUPERVISOR, MAGISTRATE, AND MENTAL HEALTH IMMEDIATELY** | | | |
| Is the inmate unable to answer questions? If yes, note why, notify supervisor and place on suicide watch until form completed. | | | |
| 1a. Does the arresting/transporting officer believe or has the officer received information that inmate may be at risk of suicide? | | | |
| 1b. Are you thinking of killing or injuring yourself today? If so, how? | | | |
| 1c. Have you ever attempted suicide? If so, when and how? | | | |
| 1d. Are you feeling hopeless or have nothing to look forward to? | | | |
| **IF YES to 2-12 BELOW, NOTIFY SUPERVISOR AND MAGISTRATE, Notify Mental Health when warranted** | | | |
| 2. Do you hear any noises or voices other people don't seem to hear? | | | |
| 3. Do you currently believe that someone can control your mind or that other people can know your thoughts or read your mind? | | | |
| 4. Prior to arrest, did you feel down, depressed, or have little interest or pleasure in doing things? | | | |
| 5. Do you have nightmares, flashbacks or repeated thoughts or feelings related to PTSD or something terrible from your past? | | | |
| 6. Are you worried someone might hurt or kill you? If female, ask if they fear someone close to them. | | | |
| 7. Are you extremely worried you will lose your job, position, spouse, significant other, custody of your children due to arrest? | | | |
| 8. Have you ever received services for emotional or mental health problems? | | | |
| 9. Have you been in a hospital for emotional/mental health in the last year? | | | |
| 10. If yes to 8 or 9, do you know your diagnosis? If no, put "Does not know" in comments. | | | |
| 11. In school, were you ever told by teachers that you had difficulty learning? | | | |
| 12. Have you lost / gained a lot of weight in the last few weeks without trying (at least 5lbs.)? | | | |
| **IF YES TO 13-16 BELOW, NOTIFY SUPERVISOR, MAGISTRATE, AND MENTAL HEALTH IMMEDIATELY** | | | |
| 13. Does inmate show signs of depression (sadness, irritability, emotional flatness)? | | | |
| 14. Does inmate display any unusual behavior, or act or talk strange (cannot focus attention, hearing or seeing things which are not there)? | | | |
| 15. Is inmate incoherent, disoriented or showing signs of mental illness? | | | |
| 16. Inmate has visible signs of recent self-harm (cuts or ligature marks)? | | | |

Additional Comments (Note CCQ Match here):

| Magistrate Notification Date and Time: Electronic or Written (Circle) | Mental Health Notification Date and Time: | Medical Notification Date and Time: |
|---|---|---|

Supervisor Signature, Date and Time: